IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 19, 2006 Session

## STATE OF TENNESSEE v. CHARLES STAN MARTIN

**Appeal from the Circuit Court for Sevier County**
**No. 10470-II     Richard R. Vance, Judge**

---

**No. E2005-02155-CCA-R3-CD - Filed September 18, 2007**

---

The defendant, Charles Stan Martin, was convicted by a Sevier County jury of one count of reckless homicide, a Class D felony, and received a four-year sentence to be served on probation. On appeal, the defendant contends that: (1) the evidence was not sufficient to support his conviction, (2) the reckless homicide statute is unconstitutional as applied to him, (3) the trial court erred in admitting evidence of a prior incident, (4) the trial court erred in failing to instruct the jury on an alibi defense, and (5) the trial court abused its discretion in denying him judicial diversion. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which DAVID H. WELLES and JAMES CURWOOD WITT, JR., JJ., joined.

Bryan E. Delius, Sevierville, Tennessee, and Richard L. Gaines, Knoxville, Tennessee, for the appellant, Charles Stanley Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; James B. (Jimmy) Dunn, District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On March 14, 2004, June Alexander fell to her death while riding the Hawk thrill ride at the Rockin Raceway amusement park in Pigeon Forge. The defendant was the general manager of Rockin Raceway and was responsible for maintenance of the Hawk. In September 2004, a Sevier County grand jury charged the defendant by presentment with second degree murder and reckless

homicide.[1] The state attempted to prove that the defendant attached a jumper wire to the electrical panel of the ride in order to bypass its safety restrictions.

At the trial, the victim's son, Cody Alexander, testified that he lived in Ashland City, Tennessee, and that he, his mother, and two aunts were visiting Pigeon Forge in March 2004 to celebrate his fifteenth birthday. He said that on March 14, 2004, the last day of their weekend trip, they visited Rockin Raceway because he wanted to ride the Hawk. He described the Hawk as a "gondola type ride" that "swings back and forth and goes upside down." He, his mother, and one aunt sat next to each other in the front of the Hawk, with Cody sitting in the center and his mother sitting on his left side. He said the ride's operator pressed a button that lowered the over-the-shoulder harnesses that were to secure them on the ride. The operator then came to them and pulled on their harnesses to check if they were secure. He said his aunt and mother had changed their minds about riding the Hawk and told the operator that they wanted to get off the ride. The operator told them that the machine would not release them from the ride until the ride had finished its course.

Cody testified that the ride began and moved backwards so far and high that they were facing the ground. He said that when it started going forward again, his mother's harness "jilted–moved a little bit." His mother said she was "loose," first in a low voice, and then loudly to his aunt. He said the ride came back down and the harness moved again. At a height of approximately sixty feet, the victim's harness opened completely and the victim fell out of her seat. At that point, the ride made a 360 degree turn. Cody said he began screaming at the attendant to stop the ride. The ride soon stopped, and he and his aunt came back down to the ground. He said he was stuck in his seat for approximately thirty minutes because his harness would not release. He estimated that his aunt was stuck in her seat for about forty-five minutes. He said that after he was released from his seat, he ran to see his mother and learned that she was dead. He said the defendant had never expressed condolences to his family.

Pigeon Forge Police Officer Mark Vance testified that he was called to Rockin Raceway around 12:15 p.m. on March 14, 2004. When he got there, he saw a young man and a woman sitting on the Hawk and the victim lying face-up on the ground. Another officer indicated that the victim was not responding, and Officer Vance went to assist the two people stuck on the ride. He said they were very upset and screaming. He said Rockin Raceway personnel were trying to get them off the ride, but he was not certain if the defendant was there. He said that after the two were released from the ride, he stayed with the young man who had been operating the ride. Police roped off the area around the ride with crime scene tape later in the afternoon and kept a log to document who came to the scene. Officer Vance said that only essential personnel should have been allowed on the scene after it was declared a crime scene.

Sevier County paramedic Timothy Hughes testified that he attended to the victim on March 14, 2004, after her fall. He said officers were on the scene when he arrived at Rockin Raceway. The

---

[1]Before the end of the trial, the court merged the two charges, as reckless homicide is a lesser-included offense of second degree murder.

victim was lying face-up on the ground. He said there was a large pool of blood above her head and that blood and cerebral spinal fluid were coming out of her ears. The victim had no pulse and was not breathing. Mr. Hughes said it appeared that she had hit her head on the compressor that was at the back of the ride. He believed that her death was instantaneous. He said he was with the victim for six or seven minutes and did not remember if the defendant was there.

Sergeant Gary Campbell of the Pigeon Forge Police Department testified that he was called to Rockin Raceway after the victim's fall. He said that by the time he arrived at the scene, the victim had been removed and the area was being treated as a crime scene. He said he took control of the crime scene log and started a crime scene log book for the day after the victim's fall. He acknowledged that there were several names on the log that did not belong to law enforcement personnel, even though he was trained to limit the public's access to a crime scene in order to preserve evidence. He said that the second day of the log included names of people representing Rockin Raceway and Zamperla, the manufacturer of the Hawk.

John Hryhorchuk testified that in March 2004 he worked as an independent insurance adjuster and was hired by the insurance company that represented Rockin Raceway to investigate the victim's fall. He said he went to Rockin Raceway in the evening and took photographs of the Hawk. He said he did not touch or lift anything from the ride or remove from or put anything on the ride. On cross-examination, he testified that he told the defendant not to talk to anyone until the defendant talked to counsel.

Pigeon Forge Police Officer Scott Finney testified that he was at Rockin Raceway on March 15, 2004, the day after the victim's death, in order to provide scene security. He said that others were also on the scene while he was there, including William Aldrich, who was with a consulting firm; the defendant; Thomas Sheehan, an attorney for Zamperla; Valerio Ferrari, a Zamperla representative; Detective Rene Kendall of the Pigeon Forge Police Department; and Jerry Lindsey, Rockin Raceway owner. Officer Finney's job was "to make sure that nobody was in there that we didn't have logged down, and that while they were in there that they didn't touch anything."

Officer Finney testified that he was present when the electrical cabinet on the back of the Hawk was opened. He said he could see electrical wiring in the box. He said two wires–one red and one black–that were attached to other wires with alligator clips caught his eye. He explained that he formerly inspected rides as the "chief safety security officer" for Silver Dollar City amusement park and that he never saw alligator clips used in the electrical panels of rides there. He said that if he had seen such wiring in a ride he would have "shut the ride down." The insulation of the wires to which the alligator clips were attached was peeled in order for the alligator clips to touch the copper wiring. He said he also saw in the electrical cabinet a cardboard box that contained, among other things, black wire and alligator clips. Officer Finney testified that he did not know how long the alligator clipped wires were in the electrical panel and did not know who put them there. He said that no fingerprints were taken from any wires. He said no one touched the inside of the electrical cabinet while he was there and that the cabinet was closed before he left the scene on March 15, 2004.

Officer Wayne Knight testified that he was an evidence technician for the Pigeon Forge Police Department. He said he went to Rockin Raceway on the morning of March 16, 2004, and that Detective Kendall was also there. He mentioned several people who were there in addition to law enforcement officers: Phil Castellano, a Zamperla technician; Niles Nimmo, an attorney for the victim's family; Thomas Sheehan, an attorney for Zamperla; Jerry Aldrich,[2] a consultant for Zamperla; Claude Wagner, a consultant for Rockin Raceway's insurance company; and Donald Howell, an attorney for Rockin Raceway. Officer Knight took photographs while the electrical cabinet was examined and while Mr. Castellano removed components from it. The electrical panel consisted of numerous wires connected to various numbered circuits. A photograph of the electrical panel when it was first opened showed a red jumper wire and black jumper wire attached with alligator clips to other wires. Officer Knight spoke in detail about the placement of the black jumper wire: "It ha[d] been attached to a black wire that ha[d] been spliced open and that wire is labeled number 144 and the other end of the black jumper is attached to another black wire that ha[d] been spliced and that number is 145." He said all the parties present had looked through the electrical panel. The next day, a test was performed on the ride, which Officer Knight videotaped. He said that once testing was complete, the ride was turned off, and he collected the black jumper wire as evidence.

On cross-examination, Officer Knight testified that he never saw the defendant put a jumper wire in the Hawk's electrical panel or perform any maintenance on the Hawk. He said that between March 14 and 17, 2004, representatives from Zamperla and Rockin Raceway had access to the ride. He acknowledged that he was trained to limit access to and movement within a crime scene to prevent alterations or destruction of evidence. He acknowledged that he did not seal off the electrical cabinet when he left the crime scene on March 15 or 16. He said that he did not take notes while Mr. Castellano modified the electrical panel and the ride, although he did take photographs and record a videotape. He discussed some of the changes that Mr. Castellano made to the ride during the investigation, including that he took panels off some seats on the ride, took top covers off the lap bars on the seats, and raised the operator panel onto a platform. He said that no one was told to wear gloves before touching any part of the machine and that Mr. Castellano did not wear gloves when opening the electrical cabinet. He said people, including Mr. Castellano, touched the black jumper wire and that no attempt was made to take fingerprints from the wire or from any other part of the electrical panel. He said he was unsure whether it would have been possible to get fingerprints off the wire and that it was not tested because of how small the surface area was.

Officer Knight testified that he collected the black jumper wire as evidence because everyone present when the ride was examined had a reaction to the presence of that wire. He said he knew it was significant but did not know how. He said that after he left the scene on March 17, 2004, he returned briefly on March 18 and then on March 24, when Ed Pribonic, who was hired by the city of Pigeon Forge and assisted by city electrician Bill Bradley, investigated the Hawk. However, the ride was not turned on after it was shut down on March 17, and Mr. Pribonic did not conduct any investigations or tests while the ride had power.

---

[2] Other witnesses referred to Mr. Aldrich as "William Aldrich."

Bradley Burns testified that he was a seasonal employee of Rockin Raceway between March 1997 and August 2001 and that he was as an assistant manager there between August 2001 and September 2002. He was working at Rockin Raceway during the time that the Hawk arrived. He said that he sometimes operated the Hawk and that, at times, the lap bars came down but the ride did not move. At these times, an alarm on the ride would sound. Sometimes when this happened, people requested to get off the ride and demanded refunds.

Mr. Burns described the Hawk's seating and restraint system. He said the seats were lined in several rows with three to a row. When he pressed a button, the lap bars[3] of each seat lowered. He said latches, or pins, were on the sides of the lap bars. These pins latched into holes on panels that were on the right and left sides of each seat. The holes into which the pins latched depended on the size of the rider. Before starting the ride, the operator was supposed to check that all lap bars were secure. He said that when an alarm sounded, he would check again that all lap bars were secure because the ride would not move if the lap bars were not all securely latched. He explained, "[If you had started [the ride] and the latches weren't out, the platforms wouldn't lower or anything. It wouldn't do anything. It would just sit perfectly still." If he discovered that the lap bars were secure on each seat, he would raise the lap bars, reset the ride, lower the bars again, and try to start the ride. He said that if he went through this procedure two or three times and the ride still did not work, he would inform the riders that they could ride another ride or get a refund. He said that if he could not get the Hawk to run, he would inform the defendant of the problem. He could not recall people opening panels to get the ride to work, although he saw Mike Stepp, an assistant manager, open a panel on the lap bars to wipe away moisture on the sensors. He said that he only saw the defendant work on the Hawk from a distance. Mr. Burns said that he had seen the ride's instruction manual but that he never actually looked through the manual himself. He said he had seen the defendant and Mr. Stepp look at it.

Mr. Burns testified on cross-examination that he never saw the defendant put a jumper wire in the Hawk's electrical panel. He said he saw the defendant working in the motor area of the ride but not in the electrical area. He said his only interaction with the Hawk's electrical system was flipping the breaker switch, which was located in the electrical panel. He said that whoever was operating the Hawk at closing time was responsible for making sure it was shut down each night and that whoever operated it in the morning would make sure it was turned on. He said different people turned the ride on and off. Mr. Burns said he saw the Hawk shortly after it was set up and saw damage to the platform that resulted from a malfunction. He said he remembered that a lady's foot was injured soon after the ride was first set up due to problems with the platform. He was present when a "push bar" was installed on the ride to prevent people's feet from being caught in the platform.

Mr. Burns described the defendant as a "great employer" who was "more than fair to all of the employees." He said the defendant exhibited a great deal of concern for the safety of the Hawk

---

[3] Several witnesses referred to the seat restraints or harnesses as "lap bars." In the summary of the facts, we use the term that the witness testifying used.

and another ride, called the Rip Line, because those two rides involved more safety concerns than other rides at Rockin Raceway. He said that when there was a problem with a ride, the defendant would check the ride and instruct employees not to operate the ride or sell tickets for it until it was fixed. There were times when the Hawk was shut down for two to three days at a time. He said he never saw the defendant take "shortcuts" relating to the rides and that the only modification he was aware the defendant ever made to a ride was once removing the air filter from a go-cart. He said the defendant expressed concern when he noticed that one go-cart was significantly faster or slower than the others, as the defendant said this created a dangerous situation. He said that the defendant was very generous and that he had no reason to believe the defendant was more concerned with selling tickets than with the safety of the Hawk.

Edward Pribonic, a mechanical engineer, testified as an expert in amusement ride safety. He was contacted by Detective Rene Kendall to investigate the Hawk in March 2004, following the victim's death. He described the ride as follows: "The ride[] consists of one long boom . . . . At the upper end is the counterweight, at the lower end are 24 passenger seats. It's hinged in the center, or has an axle in the center, and it's motor driven and it rotates clockwise and counterclockwise." He said that the "passenger gondolas" consisted of twenty-four seats in rows of three and that the ride had an "over-the-shoulder restraint mechanism" for each seat. He explained that the ride was designed to ensure that each passenger was securely restrained through a system of three locking pins on each restraint, one located behind the headrest and one on each side of the lap bar. These pins locked into access holes and sent electronic signals to the computer when they were properly secured. Mr. Pribonic said that if the ride were "configured as manufactured," it would not run if any of the three pins on any seat were not properly positioned and the proper signals were not sent to the ride's computer.

Mr. Pribonic testified that he examined the Hawk at Rockin Raceway on March 24, 2004, with the assistance of Pigeon Forge electrician Bill Bradley. He said he examined the pins and the electronic switches on the seat from which the victim fell and that all were functioning. He said he looked at the electrical panel, which was open, and saw a red jumper wire attached to two other wires, which he thought was "highly unusual." The red jumper wire was attached to wires numbered 126 and 146. He said he had never seen such a jumper wire in any ride he had ever inspected or worked on during his career. He said he also saw that some of the insulation was removed from several wires, including two wires that were next to each other, numbered 144 and 145. He was informed that another jumper wire was found connecting those two wires and was removed. He also saw some loose material and a cardboard box filled with paper and wires, which indicated to him that "someone was apparently using the electrical cabinet as a storage location." He said he also saw in the electrical cabinet a yellow jumper wire attached to another wire on one end with electrical tape.

Mr. Pribonic testified that he was asked by the Pigeon Forge Police Department to determine the probable cause of the victim's fall. He said he determined that a connection between wires numbered 144 and 145 would bypass the "entire ride restraint system." He said that when a jumper wire connected those two circuits, the seventy-two lap bar safety switches–three on each of the

twenty-four seats–became useless and no longer had any control over the operation of the ride. Thus, the ride would run even if one of the pins was not properly positioned and the switch did not send the appropriate signal to the computer. He said Mr. Burns' testimony that the ride sometimes would not operate while he was working at Rockin Raceway indicated that the safety system was not bypassed at that time. He also said that, after speaking with Ken Mace, who nearly fell out of his seat on the Hawk in July 2003, he thought that the restraint safety system was bypassed at that time. He said he "firmly believed" this because if the safety system were functioning properly, two things would have prevented the incident: (1) the "ride would never have left the station" if Mr. Mace was not secured in his seat; and (2) if some kind of force pulled the pins out of their secured position, the ride would have shut down immediately. Mr. Pribonic testified that it was "absolutely not" standard for a ride to have a jumper wire with alligator clips in its electric panel and that he was of the opinion that the black jumper wire was purposefully placed on wires 144 and 145.

On cross-examination, Mr. Pribonic testified that he did not know who put the jumper wire on the ride. He acknowledged that he was a member of the Amusement Industries Manufacturers and Suppliers International and that Zamperla, the Hawk's manufacturer, was also a member of that organization. He said he never saw the black jumper wire on the electrical panel because it was removed by the time he arrived at the scene. He also acknowledged that he did not turn on the ride during his inspection of it. Although he said he did not initially intend to power the ride, he admitted that he tried but was unable to do so. He said that the ride was the only Hawk 24 trailer-mounted ride in existence and that he was not able to look at any other ride that operated in the same fashion. He said he reached his conclusions by reviewing drawings, the ride's manual, other documents provided by the manufacturer, and witness statements relayed to him by Detective Kendall. He said he believed the ride's manual to be well-written and reliable. He said he was not an electrical engineer but consulted with one to confirm his conclusions.

Mr. Pribonic acknowledged that the Hawk had other safety systems in addition to the restraint safety system. For instance, the ride's platform had switches designed to ensure that it was completely lowered before the ride started. He said he reviewed only the restraint system and not the platform safety system. He said he learned while inspecting the ride that someone had been injured because the platform malfunctioned. He said he did not test the emergency stop button, the "go station button," or the air cylinders because to do so would have required the ride to be in operation. He said he did test the springs and switches attached to the pins on the victim's seat and determined that they were operating effectively. He admitted that the diagram he used during his direct testimony was simplified and that each seat actually had four switches, not three. He said the fourth switch indicated the position of the lap bar. He said that if a person were too large to allow the restraint to be in secure position, the fourth switch would not send a permissive signal to the computer system and the ride would not run. He said he determined that the fourth switch was not bypassed by the black jumper wire and was not directly involved in the victim's fall.

Mr. Pribonic acknowledged that he cited in his report that operator error was also a cause of the victim's fall because the operator did not properly check the victim to ensure that her restraint was secure. He said, however, that operator error would not have caused the victim's death if the

safety system had not been bypassed. He acknowledged that the Hawk was set up at Rockin Raceway by Phil Castellano within two days and that he may have earlier said that it should take at least four days to set up the ride. He said that, generally, it would be unacceptable to spend only thirty minutes training someone on how to operate the ride. He also acknowledged that the Hawk's manual appeared to have been written after the ride was already at Pigeon Forge and that normally, a ride should be delivered with its manual.

Bill Bradley testified that he worked for the city of Pigeon Forge as an electrician and that he assisted Ed Pribonic's examination of the Hawk at Rockin Raceway. He said he used a volt ohm meter to test whether the electronic switches on the victim's seat were functioning and determined that they were. He said he also tested the black jumper wire that was in the possession of police and determined that it was also functional. He said that he opened the electrical box and attempted to turn on the power for the ride but that "the main breaker was tripped." He said that he tried to reset the breaker three times but that the ride still would not operate. He testified that Mr. Pribonic wanted the ride's power turned on but that after he was unable to do so, Mr. Pribonic said they would test the ride without power.

Phil Castellano testified that he lived in New Jersey and worked for Zamperla, Inc. as a Field Service Manager. He said part of his duties involved setting up new rides, performing repairs and troubleshooting in the field, and providing technical support over the phone. He came to Pigeon Forge on March 4, 1998, to set up the Hawk at Rockin Raceway. He said that he was assisted with the set-up by the defendant and four or five other Rockin Raceway personnel and that they completed the set-up in less than one day. He said that the electrical system was involved in the set-up only to the extent that he had to run large cables into the electrical cabinet and to turn on a "set up key switch" to allow the ride to set up. He said the ride was assembled three times before it came to Pigeon Forge, once in Italy and twice at trade shows in Florida. He said he spent March 5 and 6, 1998, operating the ride and training Rockin Raceway personnel. He left on March 6 but came back in October 1998 to repair the hydraulic lifting platform of the Hawk. He said he came back again in July 2000 because of a problem with the Hawk's motor. He said he identified the problem in July 2000 as a broken coupler that joined the encoder to the motor. He said that he temporarily fixed the problem by installing a rubber hose but that he ordered a replacement coupler to be shipped to Rockin Raceway the next day. He said he used this temporary solution because the defendant wanted to keep the ride in operation. He said he instructed the defendant to install the replacement part when it arrived. However, when Mr. Castellano returned to Rockin Raceway in March 2004, following the victim's death, he saw that the replacement part was still in its package and that the temporary hose was still affixed to the motor. He said that by the second time he visited Rockin Raceway to make repairs, in July 2000, the Hawk was no longer under warranty by Zamperla.

Mr. Castellano testified that after July 2000, he did not come to Rockin Raceway again until March 16, 2004, during the investigation of the victim's death. He said that the electrical cabinet was opened on March 15, before he arrived. He said he saw red and black jumper wires in the electrical cabinet that were not there when he brought the ride to Pigeon Forge. He said that the red jumper wire connected wires numbered 146 and 126 and that the black jumper wire connected wires

numbered 144 and 145. He said he performed a series of tests in the morning of March 17, 2004, to determine what effect the jumper wires had. One test involved using a metal ruler to block the access holes for the pins on the side of the lap bar of a seat, to prevent the pins from being properly secured. Mr. Castellano said that, normally, the ride should not start in this condition. However, he said that with the black jumper wire connected, the ride started and went through a complete cycle. He conducted another test in which the lap bar of one seat was raised so that it was not in secure locking position and the locking pin behind the headrest of the seat was not properly secured. He said the ride should not be able to start in this unsafe condition but that with the black jumper wire attached, it did. He said he removed the black jumper wire from the electrical cabinet and tried to start the ride while in an unsafe position but that it did not start. He said he also tested the ride's emergency stop button. He said that the button worked but that the brakes were either worn out or out of adjustment because they did not stop the ride as fast as they should have. Mr. Castellano also identified the contents of a cardboard box found in the electrical cabinet, which included a vise grip; the package of a replacement valve sent to Rockin Raceway that was dated May 12, 2000; a module, a device that allowed the main circuit breaker of the Hawk to be turned off and on from outside the electrical cabinet; some fuses and other "small parts"; and "alligator clip jumpers," one of which looked identical to the black jumper wire that was connecting wires 144 and 145 on the electrical panel.

On cross-examination, Mr. Castellano acknowledged that the Hawk's manual given to Rockin Raceway was dated after the ride arrived at the park. He said it was possible to train someone to operate the Hawk in thirty to forty-five minutes. He said that he trained the defendant and that the defendant was responsible for training other personnel. He admitted that he told the defendant that only one person was needed to operate the ride, although the manual said that two people should operate the ride at all times. He said he became aware not long after he set up the ride that the Hawk's platform was malfunctioning and that a lady's foot was injured by it. He also acknowledged a letter he wrote to the defendant mentioning a problem involving vibrations in the motor of the ride and a problem with the "go station." He admitted that the electrical panel contained a red wire that was installed by Zamperla in Italy and that eliminated the gate sensor switch. He said that gate switches are not used in the United States and, thus, it was not built in the ride even though it was in the design. He noted, however, that this red wire was not attached to others using alligator clips and did not involve splicing other wires, as did the jumper wires connecting wires 144 and 145 and wires 126 and 146.

Mr. Castellano testified that he did not recall whether he tried to operate the ride without the black jumper wire but with all lap bars securely in place. The video of the tests done on March 17, 2004, did not show that he did. He admitted that there was an alarm to indicate if the brakes were not functioning properly, but he could not remember if he heard or saw this alarm during his tests on March 17. He said that Zamperla was a major contributor of rides at many carnivals and parks in the United States, that they made about 100 different varieties of rides, and that many of their rides could be found in Sevier County, including at Dollywood. He acknowledged that Zamperla had a financial incentive to ensure that they did not get a bad reputation in Sevier County. He said, however, that it was not in Zamperla's interests to bypass the critical safety systems of its rides.

Pigeon Forge Police Detective Rene Kendall testified that he was the lead investigator of the victim's death. He said that after he arrived on the scene for the first time on March 14, 2004, he spoke to the defendant who informed Detective Kendall that he was the general manager of Rockin Raceway. The defendant said he performed maintenance on the ride but did not have a maintenance log. Upon Detective Kendall's questions about the defendant's qualifications, the defendant said that he was not a certified mechanic but that the ride was failsafe and that anyone could run it.

Detective Kendall testified that although he did not initially believe a crime had been committed, they treated the area around the Hawk as a crime scene until further investigation. He and other officers secured the scene by questioning people and making sure only authorized people were there. He said that officers guarded the area over a twenty-four-hour period. Detective Kendall returned to the scene on the morning of March 15, along with Officer Scott Finney, William Aldrich, Tom Sheehan, Valerio Ferrari, and the defendant. While there, the group looked at the Hawk's electrical panel, and Detective Kendall said two jumper wires caught his eye. He said that no one touched the jumper wires at that time and that the defendant did not say anything or express any surprise about the presence of the wires. Detective Kendall said that before they made any alterations to the ride, they wanted to consult with someone who was "intimately familiar" with it. He said Mr. Sheehan, the attorney for Zamperla, contacted Mr. Castellano, who arrived in Pigeon Forge on March 16, 2004. On March 16, Detective Kendall was present at Rockin Raceway with Mr. Castellano and other representatives from Zamperla, Rockin Raceway, and the victim's family. He said that they looked at the electrical panel again but that no one altered anything on the machine until the next day, when tests were performed and a videotape was made.

Detective Kendall testified that he met with the defendant on August 14, 2004, at the Pigeon Forge Police Department. He said the defendant told him that Mr. Castellano and another technician from Zamperla performed maintenance on the platform soon after Rockin Raceway obtained the Hawk and that Mr. Castellano had rewired the electrical panel to nullify the gate safety function. The defendant told Detective Kendall that Mr. Castellano also returned to Rockin Raceway one time after the Hawk's warranty had expired to repair a broken coupler on the ride. Detective Kendall said the defendant told him that either the defendant or Mike Stepp "did greasing of the rides" and that the ride operators were responsible for turning on the machine each day. The defendant said David Webb, who was the Hawk's operator at the time the victim fell, was competent to run the ride. The defendant told Detective Kendall that he had instructed Mr. Webb how to turn the ride off if someone wanted to get off it.

Detective Kendall testified that the defendant denied having any knowledge of a previous incident involving someone nearly falling out of the Hawk. He said the defendant said he was aware of an incident in July 2003 in which a large man had ridden the ride without having all the pins on his lap bar secured. Detective Kendall said the defendant told him that if one safety pin was secure, the ride would run even if another safety pin was not secure as long as the insecure pin was "close enough" to the hole that was supposed to secure it. Detective Kendall asked the defendant about the red and black jumper wires. He said the defendant told him that he had never seen the jumper wires. The defendant said he only opened the electrical cabinet as necessary and that the last time he opened

the electrical cabinet was about six weeks before the victim's death. Detective Kendall also spoke with the defendant in September 2004, at which time he outlined the investigation to the defendant. The defendant again denied putting the jumper wires on the electrical panel, although he acknowledged that only he or someone from Zamperla could have done it. He said that he could not recall seeing the jumper wires on the machine but that Mr. Castellano must have put them there when he last worked on the ride in 2000. After this interview, the defendant prepared a written statement for Detective Kendall, which only outlined what the defendant did and observed after being notified of the victim's death.

On cross-examination, Detective Kendall testified that the defendant never confessed to putting the jumper wires in the electrical panel. He said he never interrogated Zamperla representatives, including Mr. Castellano, about the origins of the jumper wires. He said he also never investigated Zamperla's rewiring of the panel to eliminate the safety gate function or the platform problems. He acknowledged that Mr. Castellano did not volunteer information about past problems with the ride or the work he had done on it. Detective Kendall said he contacted Ed Pribonic after being referred to him by Robbie Fox, the security director of Dollywood. He said he accompanied Mr. Pribonic when he performed tests on the Hawk on March 26, 2004, but did not take notes or record a video. He confirmed that Mr. Pribonic did not turn on the ride while testing it. Detective Kendall recalled seeing the defendant at Rockin Raceway on March 16, 2004, but said the defendant did not come to the scene. He said he did not recall seeing the defendant on March 17. He said he would have allowed the defendant on the scene. He said that after Mr. Pribonic's investigation of the Hawk on March 26, the ride was released to the defendant with the black jumper wire removed from it.

Judy Chance, a former employee of Rockin Raceway, testified that she was working in the ticket booth on March 14, 2004. She said that she called the defendant after the victim fell that day and that the defendant arrived a short time later and immediately tried to release the victim's family members who were stuck on the ride. She said that during her time working at Rockin Raceway, the Hawk "would not work a lot of times" and that she often had to give refunds on Hawk tickets. She said that when the ride was not working, the defendant would be called because "he was the one that worked on the ride." She said that, to her knowledge, no one else fixed the ride. She said that during the nine months she worked at Rockin Raceway while the Hawk was there, she saw the defendant "work on" the ride three times. Each time, he would be working in an area behind the ride but she never saw exactly what he did or on what part of the machinery he worked. She said that after the victim's death, the defendant appeared very quiet and sad.

Jerry Lindsey, the owner of Rockin Raceway and the defendant's brother-in-law, testified that, as manager, the defendant was responsible for overseeing outside operations at Rockin Raceway, including rides and go-carts. He said the defendant was probably the person who would handle any electrical problems on the rides or make necessary repairs to the rides. He said he experienced problems with the Hawk when it was first purchased. Mr. Lindsey said the defendant was a salaried employee whose pay was not tied to the profitability of the business but who received a bonus at the end of the year, which depended, in part, on how well the business did that year. He

said that about a year before the victim's death, the defendant expressed a desire to resign his position at Rockin Raceway. The defendant agreed to continue as manager after Mr. Lindsey told him he would no longer be responsible for maintenance. Mr. Lindsey acknowledged, however, that the defendant continued after this time to oversee some maintenance on the rides and that, when interviewed by Detective Kendall, he never said the defendant had stopped doing maintenance on the rides. He said that other employees may have performed maintenance on the Hawk but that any "major problems" probably would have been handled by the defendant. Mr. Lindsey agreed that he was a "hands off" owner who was not involved in the daily operations of Rockin Raceway. He acknowledged that the business made more money when the Hawk was in operation, but he said he would never prioritize money ahead of safety.

Josh Williams testified that he worked at Rockin Raceway from March 2002 to March 2004. He said that he regularly operated the Hawk as part of his work duties and that he was fifteen years old when he first started operating it. He said the defendant was the only person he had ever seen or heard of doing electrical work on the Hawk. He said he accessed the electrical panel himself either to turn on the ride in the morning or to reset the breaker. He said he noticed the red jumper wire in the electrical panel and thought it "looked odd." He said that he saw the jumper wire when he first opened the electrical cabinet to turn on the ride and that it was there the entire time he worked at Rockin Raceway. He said he thought the red jumper wire looked unusual but was not worried about it and never talked to the defendant about it. Mr. Williams said he quit working at Rockin Raceway about a week before the victim's death.

Ken Mace testified that he lived in Indiana and that on July 22, 2003, while in Pigeon Forge on vacation with his family, he rode the Hawk at Rockin Raceway. He said that after he sat on the ride, a restraint harness was pulled over him. He described the harness as a "hard rubber covered yoke that comes down over your shoulders and across the chest" and which had two chrome handles on the outside of it. He said the ride's operator came to him to check if his harness was secure. Mr. Mace said the harness appeared to be secure. However, he said that after the ride started and went through two partial revolutions, and when he was at the highest point facing the ground, his harness "released forward" about one foot or one and one-half feet. He tried to pull the harness back down, but it was stuck. He said he then tried to keep himself steady in his seat to prevent his falling. He yelled to the operator as the ride was coming down, but the operator was standing about ten to fifteen feet away from the control panel. He said he started to slide out of his seat but held on as best he could. He said he was worried that the harnesses had released on all the seats and worried about his two children who were also riding. He said the ride made one full revolution before it stopped. After he got off the ride, Mr. Mace talked to someone at Rockin Raceway and also reported the incident to Officer Wyrick with the Pigeon Forge Police Department. Mr. Mace said that he was five feet, eleven inches tall and weighed 260 pounds.

On cross-examination, Mr. Mace testified that he was certain he saw and talked to the defendant on July 22, 2003. He said he would be shocked to find out that the defendant was attending his father's funeral in West Tennessee that day. He acknowledged that in two previous statements to police, he did not mention the defendant, but he said it was because he spoke with a

man who did not identify himself but whom he recognized as the defendant in court. Mr. Mace said he rode the Hawk between 9:00 and 9:30 p.m. on July 22, 2003. He said that afterwards, he first talked to the ticket booth operator. He said he then talked to a lady who was in the arcade and then a man, who he said was the defendant. Later that night, he reported the incident to the Pigeon Forge Police Department. He said the police officer led him to believe the matter would be referred to some state department or agency for investigation, but he was never contacted by anyone regarding the matter until Detective Kendall contacted him after the victim's death. Mr. Mace said that the defendant did not operate the Hawk when he was riding it.

Tony Hardwick, a resident of South Carolina, testified that he was at Rockin Raceway in Pigeon Forge on July 22, 2003, when Ken Mace rode the Hawk. He said he was observing his daughter, who was riding the Hawk, when he saw a man "hanging." He commented on the man to a woman who was standing next to him, who turned out to be Mr. Mace's wife. He said he only saw Mr. Mace for a "split second" because he quickly returned his attention to his daughter. It was unclear to what extent Mr. Hardwick saw Mr. Mace "hanging," but Mr. Hardwick testified that he saw Mr. Mace "holding onto something" and that it appeared at one "split second" that Mr. Mace was holding on with his hands while his entire body was out of the ride. After the ride stopped, Mr. Hardwick immediately checked on his daughter. He said he saw and heard Mr. Mace talking to the ticket booth attendant and some other people. He approached Mr. Mace and the two exchanged business cards.

Joey Dickson testified that he worked at Rockin Raceway from 1991 until 2003 and that he eventually became an assistant manager there. He said the defendant was his step-father. He said he was at Rockin Raceway on July 22, 2003, when Ken Mace rode the Hawk. After speaking with Mr. Mace, Mr. Dickson ordered that the ride be shut down until it could be inspected. He said the defendant was out of town attending his father's funeral at the time and that he and the defendant inspected the ride one or two days later. He said that the defendant "was the one who did maintenance" on the Hawk, which he said included replacing light bulbs and fuses, and that the defendant would call Zamperla if the ride was broken. He said he did not know if the defendant called Zamperla regarding the Mace incident, but he did know that Zamperla did not come to Rockin Raceway to address the problem.

Mr. Dickson said that following the Mace incident, he and the defendant checked the Hawk's seat restraint safety system by lowering the safety bars and holding them up in order for the pins in the bar not to engage in the holes in the seat. He said that they tried to start the ride while seats were in this non-secure position but that the ride would not run and an alarm sounded. Thus, they concluded that the safety system was working. He said their inspection of the Hawk following the Mace incident took one to two hours and that the defendant concluded that Mr. Mace's size likely prevented the lap bar from lowering enough for the pins to engage in the holes. He said the defendant instructed the assistant managers not to allow large people to ride the Hawk. Mr. Dickson acknowledged a prior statement in which he said that Mr. Mace was saved from falling out of his seat by the safety pin in the rear of the seat, even though the safety pins on the sides of the seat appeared not to have been engaged. He said that as designed, the ride should not have operated if

any of the safety pins were not in proper position. Mr. Dickson testified that to his knowledge, only the defendant and Phil Castellano had performed electrical work on the Hawk while it was at Rockin Raceway.

On cross-examination, Mr. Dickson testified that the Hawk had problems since it was first set up at Rockin Raceway and that it was shut down a couple of times per year. He said the ride was assembled at Rockin Raceway in two days and that he was one of the first people trained to operate the ride by Mr. Castellano. He said his training lasted about thirty minutes and that he was not shown the ride's operations manual during training. He said Rockin Raceway did not receive the manual until four to six months after the ride was set up. He acknowledged several things that Mr. Castellano did not tell him regarding the operation of the ride, including that people under the influence, pregnant women, and people with certain health conditions should not ride; that Rockin Raceway staff should perform daily checks of the ride's safety systems; and that the ride's operator should be in full control and paying full attention to the ride while it was running. He said the first problem with the ride involved a malfunction of the platform that was supposed to lower when the ride started. He said he observed Mr. Castellano and an Italian-speaking Zamperla employee work on the platform and add a hydraulic mechanism to correct the platform problems. He said they added sensors to the platform, which involved adding wires to the Hawk's control panel. He said the last time he saw Mr. Castellano at Rockin Raceway was in 2000.

Mr. Dickson testified that the defendant was a very meticulous and exacting person, that he was a demanding employer, and that he had warned Mr. Dickson against "cutting corners." He said the defendant was also fair and generous and that the defendant ran a "tight shop" at Rockin Raceway. He said the defendant made sure all go-carts ran at approximately the same speed in order to avoid accidents. He said that he knew the defendant very well and that the defendant would never recklessly injure or knowingly kill someone.

Starr Johnson testified for the defense that she was in Pigeon Forge on March 13, 2004, with a youth group, when some members of her group wanted to ride the Hawk at Rockin Raceway. She said that when several members of her group went to ride the Hawk, the lap bars would not lock down. She said operators started the ride and "swung it a couple of times" to see if the bars would lock. Eventually, they stopped the ride, and all the riders were offered a refund. Ms. Johnson said she sat on a bench and observed two men working on the Hawk for about twenty minutes before telling people that the ride was working and that people would be given a free ride. She said she was in Pigeon Forge the day of the victim's death but did not hear about it until the morning after. She said that about two weeks later, she informed the Pigeon Forge Police Department of what had happened when she was at Rockin Raceway. She said that she wrote a letter about the incident but that no one from the police department contacted her afterwards. Ms. Johnson said she did not see the defendant at Rockin Raceway while she was there.

Ms. Johnson's daughter, Chelsey Johnson, testified that she was also at Rockin Raceway on March 13, 2004. She said she sat on a nearby bench while members of her group attempted to ride the Hawk. She said riders were instructed to get off the ride and seek a refund after the lap bars

failed to lock down properly. She said that the ride's operator said he was going to find someone to fix the ride and that she saw him get another man from the arcade area to work on the ride. She said that the young man who was operating the ride stayed in the area at the front of the ride where the control buttons were but that at one point, the other man went to the rear of the ride. She said that the man was at the rear of the ride for about five minutes and that soon after he returned, they were told that the ride was working. She said that the man did not take any tools with him toward the rear of the ride and that she did not see what he did while back there.

The defendant testified that he grew up on a farm in West Tennessee, graduated from high school, and served in the U.S. Air Force, where he worked on a missile maintenance team. He worked at a paper plant before being selected for the instrument mechanic apprenticeship program with TVA. He worked for TVA for twelve years, first as an instrument mechanic, working on instruments that kept the rectors safe, and later as a quality assurance evaluator. He retired from TVA and went to work at Rockin Raceway, which was co-owned by his brother-in-law, Jerry Lindsey. He and his wife became managers; his wife managed the indoor arcade, while the defendant "would overlook everything on the outside." At that time, there were only go carts outside, but over time, Rockin Raceway acquired different outdoor rides. The defendant said that the Hawk was the last ride to arrive at Rockin Raceway. He said that Rockin Raceway owners made the decisions about what rides to acquire and that they decided to purchase the Hawk after Mr. Lindsey saw the Hawk at a trade show in Florida. It was purchased in February 1998 and set up about three weeks later by Phil Castellano. The defendant identified photographs that Mr. Castellano used in setting up the Hawk and said that Mr. Castellano did not have a manual at the time. He said that the set-up took about two days and that it took Mr. Castellano about two hours to train him and some other Rockin Raceway employees. He said that Mr. Castellano informed him that the ride was "completely automatic, completely safe, and you didn't have to know a lot more than that." Mr. Castellano told him that several safety and backup devices were on the ride and that "if the ride started, then it was safe." He said Mr. Castellano specifically told him that there was a backup safety device in the backs of the seats that would always keep a rider from falling out, even if the other safety devices failed.

The defendant testified that the Hawk had problems from its inception at Rockin Raceway. The platform began malfunctioning soon after it was set up. The defendant said that he reported the platform problems to Zamperla and that he was instructed to install a piece of metal across the platform and later to replace a rail that had broken. He said Mr. Castellano and another Zamperla associate came to Rockin Raceway and installed on the Hawk hydraulic stands that they manufactured onsite. He said the Zamperla representatives also added some wires to the electrical panel having to do with the platform system. He said the lap bars also began malfunctioning, as they sometimes would not close and sometimes would not open. He said there were also times when the bars were locked down but the ride still would not start. He said that he talked to Mr. Castellano about these problems and that Mr. Castellano taught him to reset the restraint system in order to fix the problems. He said the ride also had problems with its lights and motor. Mr. Castellano came to Rockin Raceway in July 2000 to address the motor problem and discovered that a coupling device was broken. He instructed the defendant to replace the coupling device with a rubber gas hose that

the defendant had. The defendant said he would not have performed any work on the motor without the direction of Zamperla. He said he never installed the replacement coupler that Mr. Castellano ordered because Mr. Castellano never instructed him how to install it.

The defendant testified that his responsibilities as general manager at Rockin Raceway were to oversee the outside activities and to ensure the safety of patrons. He said he performed training and made sure employees were performing their jobs properly. He said he performed maintenance on the Hawk and other rides. He listed the work he did on the Hawk as follows: replacing light bulbs, resetting breakers, replacing fuses, cleaning, and greasing. He said the only work he had ever done in the electrical panel was replacing a fan, replacing fuses, resetting breakers, and entering data in a computer upon Mr. Castellano's direction. He said that about a year before the victim's death, he stopped doing maintenance work on the rides because it was too much for him to handle, although he later said he did work in the Hawk's electrical cabinet six weeks before the victim died. He said he saw Mr. Castellano or another Zamperla associate do the following work in the Hawk's electrical panel: replace a converter, add two wires related to the platform system, add jumper wires when the gate safety switches were taken out, and turn on the alarm bypass switch during set up. He said that neither the cardboard box that was found in the electrical cabinet nor the items that were inside it belonged to him.

The defendant testified that on July 22, 2003, when Ken Mace rode the Hawk, he was in West Tennessee, due to his father's death that morning. He said that his wife informed him that someone's lap bar had come forward while riding the Hawk and that the passenger was very upset. He said he was not told that someone almost fell out of the ride. He said that when he arrived back to Pigeon Forge, he and Joey Dickson checked all the safety devices of the ride and that they all appeared to work. He said he determined that an anomaly had occurred due to Mr. Mace's large size, and he made the decision to put the ride back in operation. He said it appeared to him that the safety device in the back of Mr. Mace's seat kept him from falling out of the seat, and this was consistent with what Mr. Castellano had told him.

The defendant testified that on March 14, 2003, he was spending time with his brother, who was visiting from out of town. He said that he stopped by Rockin Raceway that morning to check in and that his brother's family spent much of the day there riding rides, including the Hawk. He said he learned about the victim's fall from the Hawk when he received a telephone call from Judy Chance on March 14, 2003. He immediately drove to Rockin Raceway and assisted the passengers who were stuck on the ride. He spoke to police three times about the victim's death, once on the scene and twice later in Detective Kendall's office. He said that during the second time he spoke to Detective Kendall, it was clear to him that he was being blamed for the victim's fall. He said that before this incident, he had never been arrested. He maintained that he did not knowingly or recklessly kill the victim and that he did not place the jumper wire on the Hawk.

On cross-examination, the defendant testified that he was aware the Hawk cost over $400,000, and that Rockin Raceway's owners had to take a bank loan to pay for it. He acknowledged that Rockin Raceway lost money every time the Hawk had to be shut down. He said

-16-

that during his fifteen years working at Rockin Raceway, he worked with twenty to thirty different rides and often looked at the manuals of those rides. He said, however, that he did not feel that the Hawk was unsafe to operate without a manual, and he estimated that the Hawk was at Rockin Raceway for four months before Zamperla sent its manual. He said he read parts of the manual but not all of it, including the parts about the need to have two ride operators and that someone should check the safety systems periodically. He said that when the Hawk had motor problems, he set up the temporary gas hose coupling in order to keep the ride running and never replaced the temporary part. He agreed that, ultimately, he made the decisions about whether the Hawk should be shut down but said he always followed Zamperla's orders.

The defendant agreed that the Hawk was the most dangerous ride at Rockin Raceway and that it could be deadly without the lap bars. He was aware that all three safety pins on the lap bar and seat of the Hawk were supposed to be secured before the ride could run. He said he did not call Zamperla after the Ken Mace incident, even though he previously had called Zamperla about other problems with the ride, such as those with the platform, fuses, and the lap bars not opening or closing. He said he did not call Zamperla because his own tests did not indicate that anything was wrong and convinced him that the ride was safe to operate. He said the ride had a one-year warranty and acknowledged that the warranty had expired by July 2003. However, he also said the warranty was expired in July 2000, which was the last time Phil Castellano or any Zamperla representative had gone to Rockin Raceway to work on the Hawk.

The defendant testified that Mr. Castellano used a key that bypassed the Hawk's security systems during the initial set-up, that the key was then locked in the office at Rockin Raceway, and that it was never used after the initial set-up. He testified that while he had opened the Hawk's electrical cabinet many times, he was not the only person who did so. He said Mike Stepp once replaced a device on the main breaker. He said he did not keep a maintenance log for the Hawk and did not think it was important to do so. He said the cardboard box full of tools that was found in the electrical cabinet could have belonged to any of the managers at Rockin Raceway. He said he never saw the red and black jumper wires on the electrical panel, including when he worked on the ride six weeks before the victim's death. He said he did not see them until after the ride was released back to him following the victim's death. He agreed that the wires looked very unusual. He said that he was present at Rockin Raceway on March 15 and 16, 2004, but that he was not part of the group that examined the Hawk. He said he was also at Rockin Raceway on March 17, 2004, when Mr. Castellano performed tests on the Hawk. He said he did not ask to be part of the group that was examining the Hawk because he was told officers wanted to restrict access to the ride and he thought someone would call if he was wanted. He agreed that no one told him he could not be involved. The defendant testified that he did not tell Detective Kendall that he never had problems with the Hawk's lap bars. He said Detective Kendall lied when he said that the defendant told him that the only people who could have attached the jumper wire to the electrical panel were the defendant and Mr. Castellano. He denied that the reason he did not call Zamperla about the Mace incident was because the ride was out of warranty.

The defendant's brother, Ted Martin, testified that on July 22, 2003, the defendant was in West Tennessee with him, making arrangements for their father's funeral. He said that he was with the defendant on March 13, 2004, the day before the victim's death and that they stopped by Rockin Raceway for about fifteen minutes. He said that they left and that while they were at the flea market, his family was at Rockin Raceway riding the Hawk.

Milford Brinton testified for the defense as an expert in electrical engineering. He said he examined the electrical design of the Hawk and reviewed the ride's manual, which included logic diagrams and wiring schematics. He reached the conclusion that the defendant did not put the jumper wires on the Hawk that bypassed the Hawk's safety systems. He said the ride could not have operated without the jumper wires and that the wires had to have been in place when the ride was operated at the trade shows in Florida, before Rockin Raceway purchased it, and when it was first set up at Rockin Raceway. Mr. Brinton explained that circuits numbered 144 and 145, upon which the black jumper wire was found, each involved multiple switches that needed to be closed for an electric relay signal to allow the ride to "leave the station." He said that number 144 contained switches that closed when the seat restraints were lowered to a safe position. Number 145 contained switches corresponding to the three safety locking pins on each of the twenty-four seats, for a total of seventy-two switches. He said the ride should have been designed for each switch to close only when the corresponding pin was locked, thus preventing the ride from running if any of the seventy-two pins were not secure. He said that as the schematics were actually designed, however, some of the seventy-two switches were opened even when all the seventy-two pins were locked. He attributed this to a design defect. He said that a jumper wire could be installed on the wire for circuit 145 to bring electricity to that circuit and allow the ride to run. He said that this would bypass the safety switches and allow the ride to run regardless of whether the pins were in their proper positions. Mr. Brinton said that Ed Pribonic's simplified diagram of circuits 144 and 145 was not accurate in that it did not actually show the position of the switches as designed. He said that the same design defect on circuit 145 was also on circuit 146 and that the red jumper wire was connected to that circuit to correct the defect. He said that, in his experience, the use of jumper wires was a common way to troubleshoot electrical problems.

On cross-examination, Mr. Brinton testified that he did not try to run the ride because it was inoperative. He said running the ride was not necessary to his investigation, although he agreed that he could have demonstrated the effects of the jumper wires and supported his theory that the machine had a design defect by running the ride with and without the jumper wires. He said that he relied on the design drawings to reach his conclusion and that he had studied those for about a month. He identified a red wire that had been installed by Zamperla to bypass the ride's safety gate switch and was installed in a manner he said was less temporary and more consistent with what he would have done than were the jumper wires installed on the circuits dealing with the lap bar safety system. He said the way the wires on circuits 144 and 145 were installed, by attaching them with alligator clips to "skinned" wires, was common in troubleshooting and that they may have been placed that way in haste, such as when the ride was set up at a trade show. He said he would not have left the wires that way for the long-term because he preferred to do neat and meticulous work. He said that it was also not uncommon to find a box of tools in a machine's electrical cabinet. He acknowledged,

-18-

though, that this was the only amusement ride electrical cabinet into which he had looked. He explained that the difference between his conclusion and Mr. Pribonic's conclusion was that Mr. Pribonic assumed all the switches on circuit 145 would close when the pins were secured, whereas he found that the circuit was designed defectively such that some of the switches were open when the corresponding pins were secured. Mr. Brinton acknowledged that he was being paid for his services in investigating the Hawk and testifying in court.

Frank Johnson, the owner of an engineering consulting firm in Texas, testified as an expert in the fields of mechanical engineering, electrical engineering, and amusement ride safety inspection. He said he was contacted in April 2005 to review the manual and schematics for the Hawk, along with Mr. Pribonic's report and some other documents. He said he reviewed the Hawk's electrical diagrams with the assistance of Mr. Brinton, who works for his consulting firm. He said he agreed with Mr. Brinton's testimony that the Hawk was defectively designed. He said Mr. Pribonic's simplified drawing of circuit 145 was not accurate, in part because it omitted representations of the switches that were normally closed when the pins were not in position. He stated that the way the ride was designed, jumpers had to be placed on circuits 144, 145, 146, and 126 in order for the ride to operate. He agreed with Mr. Pribonic that the jumpers bypassed the safety restraint systems, but he stated that Mr. Pribonic did not answer the question of why the jumpers were there. He said the answer was that the ride would not operate without them. He said he watched the video which showed Mr. Castellano and others performing tests on the Hawk after the victim's death. He said he noted a serious omission in the testing in that the Hawk was not operated with all the seat restraints down, pins secured in place, and jumpers removed.

On cross-examination, Mr. Johnson testified that he did not prepare a report because he was not asked to. He said he did not know whether the jumpers were first put on the Hawk while it was at the manufacturing plant in Italy because he did not know whether it was set up and operated there. He said the wires had to have been in place the first time that the ride was fully assembled and operated. He said that he would have noticed the jumper wires on the electrical panel because he would be looking for them but that it was conceivable that the defendant did not notice them, as he could not be certain that he would have seen them if he were not expecting them. He agreed that attaching jumper wires with alligator clips, as was done on the Hawk, was not a good practice and that he would not have done it. He said that, as a safety inspector, if he noticed the jumper wires, he would have shut down the ride until he determined what anomaly the jumpers were supposed to be correcting. He said he never tried to operate the ride.

On rebuttal, Audie Layman testified that he worked at Rockin Raceway in the summers of 1997, 1998, and 1999. He said he started working at Rockin Raceway soon after the Hawk was first set up. He said he had operated the Hawk and that on occasions the ride would not start because not all the lap bars were secured. He said that when the ride would not start, he would walk around to each seat and see which one was not properly secured. He said he could tell which one was not secure because red lights beside each seat would light up if the pins were locked. He said he had to stop relying on the red lights because some of the lights burned out over time and were never

replaced. He said that up to the time that he left Rockin Raceway in 1999, the ride would not start unless the lap bars on all the seats were secured.

Christopher Caldwell testified that he worked at Rockin Raceway from the spring of 1998 until July 2000. He said he became a manager during his second year working there. He said that he operated the Hawk on many occasions and that, on some occasions, the ride would not start after he lowered all the lap bars and tried to start it. He said that when that happened, he had to check each seat to make sure the safety pins in the lap bars were extended in their proper positions. He said if the ride still did not start after he checked all the lap bars, he would have to reset the control panel, raise the bars, and start over again. He said the ride would not start unless all the lap bars were secured. Mr. Caldwell agreed that the defendant was fair and generous and that he was concerned for the safety and well-being of others. He never saw the defendant place a jumper wire in the Hawk.

Robert Fox testified that he was the Director of Safety and Security at Dollywood and formerly worked in law enforcement. He said that in his position at Dollywood, he was responsible for ensuring that rides were safely maintained, which involved overseeing the set-up of new rides. He said that Dollywood had recently acquired four new rides manufactured by Zamperla and that Phil Castellano had assisted in assembling those rides. He said Mr. Castellano was professional and competent. He said that none of the rides had wires connected with alligator clips in them and that he would not have allowed a ride with alligator-clipped jumper wires to be operated. He said that Dollywood personnel checked the emergency stop button and lap bar safety restraints on their rides daily. He kept a maintenance log on the rides that documented problems with the rides and who was performing work on them. He said he referred the Pigeon Forge Police Department to Ed Pribonic. He said rides are usually set up using the ride's manual, not just pictures, and that if he did not receive a manual for a ride and he thought he needed the manual, he would not let anyone ride it until the manual was received.

Based on this evidence, the jury found the defendant guilty of reckless homicide as a lesser-included offense of second degree murder. After a sentencing hearing, the defendant received a sentence of four years to be served on probation.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence presented at trial was not sufficient to convict him of reckless homicide. He argues that (1) the circumstantial evidence did not prove that he placed on the Hawk the jumper wire that bypassed the ride's safety restrictions, (2) evidence was insufficient to show that he was aware of and disregarded a substantial and unjustifiable risk that constituted a gross deviation from a standard of care, and (3) that his actions were not the proximate cause of the victim's death. The state counters that the evidence was sufficient.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u>

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998).

### A. Circumstantial Evidence

The defendant contends that the state's circumstantial evidence did not prove that he placed on the Hawk the jumper wires that bypassed the ride's safety restraint system. He argues that, in fact, the evidence proves his alternate theory: that the ride could not operate without the jumper wires and that, thus, the wires were on the Hawk since it was first assembled and operated, before arriving at Rockin Raceway.

The defendant was convicted of reckless homicide, which is defined as the "reckless killing of another." T.C.A. § 39-13-215. "Reckless" means that

> a person [] acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

T.C.A. § 39-11-302(c).

The state's primary theory of the case was that the defendant attached to the Hawk's electrical panel a jumper wire that bypassed the safety restrictions of the ride and that led to the victim's fall and death. The state presented no direct evidence that the defendant placed the jumper wire on the Hawk but rather attempted to prove the defendant's conduct through circumstantial evidence. Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, to warrant a criminal conviction on circumstantial evidence alone, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt." Pruitt v. State, 3 Tenn. Crim. App. 256, 267, 460 S.W.2d 385, 390 (1970). While following these guidelines, we must note that the jury decides the weight to be given to

circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Marabel v. State, 203 Tenn. 440, 452, 313 S.W.2d 451, 457 (1958) (quoting 2 Wharton's Criminal Evidence 1611).

We review the evidence regarding the placement of the jumper wires in the light most favorable to the state. The defendant was responsible for performing regular maintenance on the Hawk and other rides at Rockin Raceway. The defendant, alone from Rockin Raceway, was known to perform repairs and work in the electrical cabinet of the Hawk. When employees experienced problems with the ride, they notified the defendant, who worked on the ride and who made the decision whether to put the ride in operation or to shut it down. Two jumper wires were attached in an unusual manner to existing wires in the Hawk's electrical panel, one of which had the effect of bypassing the safety restraint mechanisms on the ride, thereby allowing the ride to operate even if all the lap bars on the ride were not secured. Several people who investigated the ride after the victim's death said they noticed the jumper wires in the electrical panel and thought them highly unusual. According to the state's expert witness, Mr. Pribonic, the ride was designed to prevent itself from operating unless all the pins securing all the lap bars were locked in place. Several Rockin Raceway employees testified that the ride would not operate unless the pins securing the lap bars on all the seats were locked in place. Rockin Raceway personnel experienced many problems with the Hawk, and the ride would not operate on many occasions. Josh Williams, a former Rockin Raceway employee, noticed the jumper wires in the electrical panel after he started working at Rockin Raceway in March 2002. By the time that Ken Mace's lap bar became loose while riding the Hawk, the safety restraint mechanism had been bypassed, allowing the ride to operate even though Mr. Mace's lap bar was not secure. The defendant did not contact anyone from Zamperla, the ride's manufacturer, regarding this incident. A cardboard box containing tools, a package addressed to Rockin Raceway, and jumper wires matching those found on the Hawk was stored in the ride's electrical cabinet. According to Detective Kendall, the defendant acknowledged that only he or someone from Zamperla could have put the jumper wires on the ride. Phil Castellano said that when he examined the ride after the victim's death, he noticed the red and black jumper wires, which he said were not on the ride when he assembled it at Rockin Raceway.

In the light most favorable to the state, the evidence reflects in particular that the black jumper wire was installed on the Hawk sometime after Mr. Castellano last worked on the ride in July 2000. According to Bradley Burns, in September 2002, an alarm on the ride would sound and the ride would not move if the lap bars were not all securely latched. This is evidence that the safety system was operating at that time. In July 2003, Mr. Mace was able to ride the Hawk, despite his restraint not being secure. According to Mr. Pribonic, the Mace incident was indicative of a safety system bypass in July 2003. There was additional evidence to refute the defendant's claim that the safety system had been bypassed before the Hawk arrived at Rockin Raceway. Rockin Raceway employees Audie Layman and Christopher Caldwell testified that in 1999 and 2000, the ride would not start if the lap bars were not secure.

The defendant avers that the evidence at trial actually proves that he did not place the jumper wires on the ride. He points to the testimony of his two expert witnesses, Mr. Brinton and Mr. Johnson, that the ride was defectively designed such that it was inoperable without the jumper wires. They stated that because the ride was assembled and operated before it was purchased by Rockin Raceway, the jumper wires must have been on the ride before the defendant ever had access to it. At trial, the defendant presented the theory that someone from Zamperla, presumably Mr. Castellano, had placed the jumper wires on the Hawk. The jury had the opportunity to hear and consider this theory. They considered the defendant's testimony that he did not place the jumper wires on the ride and that he, in fact, had never even seen the wires there even though he performed various maintenance tasks in the electrical cabinet. The jury likewise considered Mr. Castellano's testimony that the wires were not in the ride when he first set it up at Rockin Raceway. The jury heard the testimony of Mr. Pribonic and the contrary testimony of Mr. Brinton and Mr. Johnson. It is true that none of the experts or any other witnesses attempted to operate the ride without the black jumper wire but with all the seat restraints secured. However, as noted above, the state did present testimony from Rockin Raceway employees that there was a time during which the ride would operate only if all the seat restraints were secured, which indicates that the safety system was not bypassed at that time. Rockin Raceway staff understood that each of the safety pins on each seat had to be secure for the ride to start. It is the province of the jury to weigh conflicting evidence and to judge the credibility of witnesses. If the jury accredited the testimony of Mr. Castellano, Mr. Pribonic, and the various Rockin Raceway employees, it could reject the defendant's theory that the jumper wires were on the Hawk before it arrived at Rockin Raceway and accept the state's theory that the defendant had placed the wires on the ride. As such, the evidence was sufficient to prove that the defendant was responsible for placing on the ride the jumper wire that bypassed the safety restraint mechanisms.

### B. Proof of Recklessness

To prove that the defendant's actions constituted recklessness, the state's evidence must show that the defendant was aware of but consciously disregarded a substantial and unjustifiable risk, which risk constituted a gross deviation from the standard of care that an ordinary person would have exercised under the same circumstances. See T.C.A. § 39-11-106(a)(31). The defendant contends that the evidence at trial failed to prove any conduct of his that constituted recklessness. He argues that he was not aware of a substantial and unjustifiable risk of death and that no conduct of his amounted to a gross deviation from a standard of care. The state argues that the defendant's actions regarding the jumper wires and the Ken Mace incident are sufficient proof that he was aware of but disregarded a substantial risk and that he acted in gross deviation of the applicable standard of care.

### 1. Awareness of Risk

To be culpable for reckless homicide, a defendant must have been aware of, but consciously disregarded, a substantial and unjustifiable risk, which disregard resulted in the victim's death. See T.C.A. § 39-11-302(c) (defining "reckless" mental state). Reckless homicide differs from criminally negligent homicide only in that the latter requires that the defendant ought to have been aware of the risk. Id. at § 39-11-302(d) (defining "criminal negligent" mental state). This court has explained

the findings a jury must make in determining whether someone is guilty of criminally reckless behavior:

> The risk of which the accused is aware must be substantial in order for the recklessness judgment to be made. The risk must also be unjustifiable. The awareness of the risk is measured from the actor's point of view. The question remains as to what standard is used in determining how substantial and how unjustifiable the risk must be in order to warrant a finding of culpability. These are questions to which the jury must evaluate the actor's conduct and determine whether it should be condemned. Thus, the jury must answer two questions: (1) to what extent was the actor aware of the risk, of factors relating to its substantiality, and of factors relating to its unjustifiableness; and (2) whether the actor's conscious disregard of the risk justifies condemnation.

State v. Dean Benjamin Clark, II, No. 02C01-9705-CC-00186, Hardeman County, slip op. at 7 (Tenn. Crim. App. May 8, 1998). Although a crime defined by a reckless mental state requires that the offender was actually aware of the risk, the Sentencing Commission Comments to section 39-11-302(c) explain that "reckless" conduct "provides liability for conscious risk creation where there is no desire that the risk occur or no awareness that it is practically certain to occur."

In the present case, the evidence proved that the Hawk's electrical panel was altered by the black jumper wire to bypass the safety restraint mechanisms of the ride and allow the ride to operate even if riders were not secured in their seats. The defendant admitted at the trial that the ride could be deadly without its lap bars, or seat restraints. The presence of the black jumper wire created a condition allowing the ride to make its 360 degree rotations, to a height of sixty feet, without a rider's seat restraint being properly secured. We conclude that the presence of the jumper wire on the Hawk created a substantial and unjustifiable risk of injury or death to those who rode it.

The evidence must also be sufficient to prove that the defendant was aware of this risk and that he consciously disregarded it. Having concluded that the evidence is sufficient to prove that the defendant placed the jumper wires on the Hawk, we likewise conclude that the evidence is sufficient to prove that the defendant was aware of the risk he created. Mr. Pribonic testified that, in his opinion, the person who put the black jumper wire on the ride was attempting to bypass the safety restraint mechanisms of the ride. There was also circumstantial evidence from which the jury could infer that the defendant was aware of the dangerous condition of the ride. For instance, the jury could infer from the defendant's actions following Mr. Mace's near-fall from the ride–particularly, that the defendant examined the ride and did not contact Zamperla about the problem–that he was aware a substantial risk existed. Furthermore, the jury could infer that the defendant knew the function of the wires and circuits that he attempted to manipulate through the jumper wires, especially considering that the defendant had possession of the Hawk's instruction manual which included wiring schematics. The defendant makes much of the fact that he allowed his family

members to ride the Hawk, from which he means us to infer that he was not aware of any risk involved with riding the Hawk in its condition. However, it is not necessary that the defendant was aware that the restraints were likely to come loose and someone was likely to fall from the ride. Riders still could have been safe on the ride as long as the seats were properly secured. The substantial and unjustifiable risk which was created by the black jumper wire was that the ride would operate and make its 360 degree revolutions even if someone was not securely restrained in his or her seat. The evidence was sufficient to prove that the defendant was aware of this risk and consciously disregarded it.

2. Gross Deviation from the Standard of Care

With the evidence being sufficient to establish that the defendant was aware of the substantial and unjustifiable risk created by the safety restraint mechanisms being bypassed on the Hawk, the next question is whether the evidence was sufficient to show that the defendant's disregard of the risk constituted a gross deviation from the standard of care of an ordinary person under the circumstances. The defendant argues that the required showing was not made, as evidenced by the defendant's affirmative steps to ascertain the cause of Mr. Mace's problem with the ride and the defendant's instructions to employees to prevent obese people from riding the Hawk. The defendant further argues that there was no clear standard of care that the defendant violated. The state counters that a gross deviation from a standard of care was proved by evidence that the defendant had apparent knowledge of a potentially dangerous amusement ride under his control and did not take sufficient measures to protect patrons from the dangerous condition.

When determining whether a defendant's conduct constituted a gross deviation from the standard of care that an ordinary person would exercise under the circumstances, we may look to the civil law of negligence for guidance and instruction. State v. Roger Hostetler, C.C.A. No. 02C01-9707-CC-00294, Lauderdale County, slip op. at 9-11 (Tenn. Crim. App. Mar. 27, 1998). However, criminal liability is based on a higher degree of negligence than that required for civil liability. T.C.A. § 39-11-302(d), Sent'g Comm'n Cmts. Where a mere deviation from a standard of care may result in civil liability, criminal culpability based on recklessness or negligence requires a "gross deviation." Roger Hostetler, slip op. at 12. To convict someone of reckless homicide or criminally negligent homicide, evidence must show that the accused knew, or should have known, "that his or her conduct, or the result of the conduct, will imperil the life of another given the circumstances that exist when the conduct takes place." State v. Goodwin, 143 S.W.3d 771, 779 (Tenn. 2004) (quoting State v. Adams, 916 S.W.2d 471, 474 (Tenn. Crim. App. 1995)). Consequently, our courts have upheld convictions only in cases in which "the risk is of such a nature and degree that injury or death is likely and foreseeable." State v. Gillon, 15 S.W.3d 492, 498 (Tenn. Crim. App. 1997).

We do not agree with the defendant's argument that he cannot be criminally culpable for his conduct because there was no standard of care regarding his maintenance and operation of the Hawk. Under civil law, operators of amusement rides owe a high duty of care toward patrons of their rides–"the same degree of care owed by a common carrier to its passengers," which is "that care which the most prudent man would be expected to exercise under circumstances similar to those

shown in evidence, in the design, construction, maintenance, inspection, and repair of his vehicle and its approaches and exits." Lyons v. Wagers, 55 Tenn. App. 667, 675, 404 S.W.2d 270, 274 (1966) (quoting Tennessee State Fair Ass'n v. Hartman, 134 Tenn. 149, 161, 183 S.W. 735 (1915); Banner v. Winton, 28 Tenn. App. 69, 70, 186 S.W.2d 222 (1944)). Furthermore, the duty of care in criminal cases may be dictated by common sense, such as in cases in which a person exercises "extremely poor judgment" in the handling of a dangerous weapon. Goodwin, 143 S.W.3d at 779 (affirming defendant's conviction for reckless endangerment and criminally negligent homicide based on defendant's actions in leaving loaded, cocked weapon in the woods behind a crowded neighborhood). A thrill ride like the Hawk has the potential for being extremely dangerous, even deadly. The defendant recognized this. It is common sense that as the general manager of an amusement park, the defendant, who admitted that he was responsible for the maintenance and safety of the rides under his charge, had a duty, in the least, to take reasonable measures to protect patrons against foreseeable death and injury related to the rides.

Both parties cite the case of Roger Hostetler in their arguments regarding whether the defendant grossly violated the standard of care that an ordinary person would exercise. The defendant in that case was convicted of criminally negligent homicide after two of his dogs attacked and killed his elderly neighbor. A few weeks earlier, the dogs had attacked the victim and her husband, who informed the defendant of the incident. Id., slip op. at 3. Evidence showed that the dogs had been digging holes under their fenced enclosure to escape and that a sawhorse had been placed in the path of one of the holes, presumably to keep the dogs from leaving that way. Id., slip op. at 5. In reviewing the defendant's conviction, this court first summarized the standard of care in civil law that a dog owner owes to others and determined that the applicable standard of care the defendant owed to the victim "was to save her from harm once he elects to keep the dogs after he 'ought to have been aware' of the danger." Id., slip op. at 12. The court concluded that there was sufficient evidence that Hostetler grossly violated this standard of care when he had been informed of a previous occasion when his dogs may have attacked the victim and her husband, had apparent knowledge of a breach allowing his dogs to escape from their fenced enclosure, and took insubstantial efforts to correct this breach. Id., slip op. at 14.

The defendant in the present case argues that his actions are distinguishable from those of the defendant in Hostetler in that he made an effort to determine what caused Mr. Mace's seat restraint to move and took measures to prevent the incident from reoccurring when he instructed employees not to allow obese people to ride the Hawk. We disagree with the defendant that his actions were sufficient to avoid criminal liability. As discussed above, the evidence was sufficient to prove that the defendant was aware that a malfunction of the seat restraints had occurred and, thus, that the ride was in a condition in which serious injury or death was foreseeable. The defendant had a duty to protect patrons from such a risk. The evidence was sufficient to prove that the defendant actually put patrons at risk by altering the electrical panel of the Hawk and bypassing the safety restraint mechanisms. That the defendant informed employees not to allow obese people to ride the Hawk was an insubstantial effort to avoid liability, just as was Hostetler's attempt to prevent his dogs from leaving their fenced enclosure by merely placing a sawhorse in the path of a hole. We also reject the defendant's argument that his actions were not criminal in light of the fact that several

-26-

months passed between the Mace incident and the victim's death, during which time no other problems with the seat restraints were reported. The defendant should have been aware at least from the time of the Mace incident, if not before, of the substantial and unjustifiable risk that existed. That it took nine months for the harm of this risk to be realized does not absolve the defendant.

As previously noted, our courts have upheld reckless homicide and criminal homicide convictions in cases in which "the risk is of such a nature and degree that injury or death is likely and foreseeable." Gillon, 14 S.W.3d at 498. The risk involved in the present case–that people could ride the Hawk without being restrained in their seats–was such that injury or death was likely and foreseeable. The defendant's disregard of this risk was a gross deviation from the standard of care that an ordinary person would exercise under the circumstances.

## C. Causation

The defendant's final challenge to the sufficiency of the evidence is that the evidence was insufficient to prove that the defendant's actions were the cause of the victim's death. He argues that because the evidence cannot support a finding that he placed the jumper wires on the Hawk, the evidence also cannot prove that he was the actual cause of the victim's death. He also cites three intervening causes of the victim's death, which he says negate his culpability: (1) that the ride operator and ticket booth attendant disobeyed his orders not to allow obese people to ride the Hawk by allowing the victim to ride; (2) that the operator did not adequately check the victim's restraint before starting the ride; and (3) that the operator refused to allow the victim to get off the ride when she requested.

We reject the defendant's argument. We have concluded that the evidence was sufficient to show that the defendant placed on the Hawk the jumper wire that bypassed the safety restraint mechanisms. Regarding intervening causes, to convict the defendant of homicide, "it is not necessary that his act or failure to act be the sole cause, nor the most immediate cause of death. It is only necessary that the defendant unlawfully contributed to the death of the deceased." State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982) (citing Letner v. State, 156 Tenn. 68, 299 S.W. 1049 (1927)). The requisite causation is generally "established by showing that the victim's death was the natural and probable result of the defendant's unlawful act." State v. Ruane, 912 S.W.2d 766, 774 (Tenn. Crim. App. 1995). Whether the defendant's actions were the proximate cause of the victim's death is a factual issue to be determined by the jury. Id. at 775.

It is true that the victim would not have died if the ticket booth attendant had not sold her a ticket to ride the Hawk or if the ride operator had not permitted the victim to ride, had properly checked the security of her restraint, or had allowed the victim to get off the ride when she asked. However, none of these facts would have led to the victim's death if the safety restraint system was working properly and the ride was prevented from operating without the victim's seat restraint being secured. The risk of death preceded the actions of the ticket booth attendant and ride operator. The victim's death was the natural and probable result of the defendant's recklessness. Thus, the evidence was sufficient to prove causation.

In summary, we conclude that the evidence was sufficient to support the defendant's conviction for reckless homicide.

## II.  CONSTITUTIONALITY OF RECKLESS HOMICIDE STATUTE

The defendant contends that our reckless homicide statute is unconstitutionally vague as applied to him because, in the absence of any state regulations governing amusement ride safety or other established standard of care, the defendant did not have notice that his conduct could subject him to criminal liability.  He does not argue that the statute is unconstitutional on its face; rather, he argues that the state failed to provide a reasonable standard of care, the violation of which subjected him to criminal sanction.  Thus, the defendant argues, his conviction for reckless homicide violated the fair warning requirement embodied by the due process clause of the Fourteenth Amendment to the United States Constitution.  The defendant acknowledges that he failed to raise this issue in his motion for a new trial, explains that his counsel only recognized the propriety of this issue while preparing his appellate brief, and asserts that he is entitled to relief under plain error review.  The state contends that the issue is waived and that, because there is no plain error, the defendant is not entitled to relief under plain error review.

Because the defendant failed to raise this issue in his motion for a new trial, he has waived the issue, Tenn. R. App. P. 3(e), and is only entitled to relief on its basis if plain error has occurred, Tenn. R. Crim. P. 52(b).  Under Tennessee Rule of Criminal Procedure 52(b), appellate courts can consider an error that was not raised in the motion for new trial when that error "has affected the substantial rights of the accused" and when consideration of the error is "necessary to do substantial justice."  When deciding whether an error constitutes "plain error" we are to consider the following factors:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)) (footnotes omitted).

We conclude that consideration of this issue is not necessary to do substantial justice because no clear and unequivocal rule of law was breached.  The "fair warning requirement" embodied in the due process clause prohibits holding an individual "criminally responsible for conduct which he could not reasonably understand to be proscribed."  United States v. Harriss, 347 U.S. 612, 617, 74 S. Ct. 808, 812, 98 L. Ed. 989 (1954).  In State v. Butler, 880 S.W.2d 395 (Tenn. Crim. App. 1994), this court rejected the argument that the culpable mental state described by the criminal negligence definition in Tennessee Code Annotated section 39-11-202(d) was unconstitutionally vague.  The court explained:

In simple terms, the statutory definition of criminal negligence relates to (1) the defendant's conduct, (2) a substantial and unjustifiable risk existing at the time of the conduct or resulting from the conduct, (3) the defendant's failure at the time of the conduct to perceive the risk, and (4) that failure being a gross deviation from the standard of care of an ordinary person under the circumstances. The Sentencing Commission Comments to T.C.A. § 39-11-302(d) state that the definition "is in line with case law of Tennessee on the degree of negligence required for criminal culpability." In this respect, criminal negligence has historically been recognized as an appropriate standard for assessing criminal liability. See, e.g., <u>State v. Davis</u>, 798 S.W.2d 268, 271-72 (Tenn. Crim. App. 1990). We conclude that the statutory definition provides adequate notice of what conduct is covered.

<u>Butler</u>, 395 S.W.2d at 397. Thus, the element of both criminally negligent and reckless homicide involving a "gross deviation from the standard of care" is not unconstitutionally vague. Regarding the defendant's claim that it is unconstitutionally vague as applied to him, we note that the defendant has not cited any authorities that a state regulation is necessary to define the standard of care. The defendant also argues that the state's citation in its brief to civil authorities to establish the standard of care, as well as the state's argument that he was properly denied judicial diversion because of the deterrent effect his conviction will have on amusement park owners and ride operators in Sevier County, demonstrate the lack of an established standard of care. However, as we discussed previously, civil common law can be instructive in determining whether criminal negligence or recklessness has occurred, and the evidence sufficiently showed that the defendant's actions constituted a gross deviation from the standard of care of an ordinary person under the circumstances. We see no clear and unequivocal rule of law that was violated by the defendant's conviction. Thus, further consideration of this issue is not necessary to do substantial justice.

### III. EVIDENCE OF KEN MACE INCIDENT

The defendant argues that the trial court erred in admitting evidence related to Ken Mace's experience on the Hawk on July 22, 2003. Before trial, the defendant filed a motion in limine to exclude this evidence under Tennessee Rule of Evidence 404(b). At the hearing on the motion, Mr. Mace, Mr. Pribonic, Mr. Dickson, and Ted Martin testified, and their testimony related to the events of July 22, 2003, was substantially the same as it was during trial. The defendant also called the defendant's niece, Paulette Martin, at the motion hearing. She corroborated Ted Martin's testimony that the defendant was in West Tennessee on July 22, 2003. The state presented evidence of another witness, Robert Butler, who said his harness came loose while he was riding the Hawk in August or September 2003. At the conclusion of the hearing, the court ruled that evidence of the July 22, 2003 incident involving Mr. Mace was admissible, stating that the evidence was relevant to the issues of the mental state requirement of the offense, causation, and identity. The trial court

excluded evidence involving Mr. Butler on the basis that the circumstances surrounding this incident were not established by clear and convincing evidence.

Tennessee Rule of Evidence 404(b) prohibits the introduction of evidence of other crimes or acts, except when the evidence of other acts is relevant to a litigated issue, such as identity, intent, or motive, and its probative value is not outweighed by the danger of unfair prejudice. The rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for some other purpose. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling and the reasons for admitting the evidence;
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). The purpose of the procedural requirements of Rule 404(b) is to prevent the admission of a prior act of the defendant which has no relevance except to prove the defendant's character and that the defendant acted in conformity with that character in committing the crime charged. See Tenn. R. Evid. 404(a); DuBose, 953 S.W.2d at 653; Neil P. Cohen et. al, Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2005). We review a trial court's ruling on evidentiary matters under Rule 404(b) for abuse of discretion, provided the trial court has substantially complied with the procedural prerequisites of the rule. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). If the court did not substantially comply with the procedure, its decision is not entitled to deference by the appellate court. See id. at 653.

We conclude that the evidence was admissible non-character evidence. The evidence was relevant to the mental state element of the crime, as the evidence indicates the defendant's awareness that the safety features of the ride were not functioning properly. The evidence established that, in the least, the defendant was aware that several months before the victim's death, someone's seat restraint "came loose" while on the ride, even though the ride was not supposed to start unless all restraints were secure. Evidence that the defendant examined the ride after this incident and did not consult Zamperla is also circumstantial evidence that the defendant was aware of the condition with the jumper wires. Further, as the trial court stated, the evidence is relevant to the issue of identity.

-30-

Evidence that it was the defendant whom Rockin Raceway personnel called in response to this incident and that it was the defendant upon whom they relied to inspect and perform maintenance on the ride is circumstantial evidence that it was the defendant who altered the electrical panel.

In sum, this evidence was not admitted to prove the character of the defendant. The trial court complied with the procedures in Rule 404(b) and determined that the evidence was admissible. The trial court did not abuse its discretion in admitting the evidence.

The state also argues that the evidence is admissible because its theory of the case was broader than just that the defendant put the jumper wires on the ride; rather, the state argues that evidence that the defendant put the ride in operation following Mr. Mace's incident is itself evidence of criminal conduct. The defendant responds that this argument amounts to an unlawful variance of the stated prosecution theory at trial. Having held that the evidence was sufficient to prove that the defendant did place the jumper wires on the Hawk and that evidence of the Mace incident is relevant, non-character evidence, we will not further address the defendant's complaints.

## IV. ALIBI DEFENSE

The defendant contends that the trial court erred in failing to instruct the jury on the defendant's alibi defense. The state counters that the trial court did not abuse its discretion in failing to charge the jury on the alibi defense because the defendant's presence at the scene of the victim's death was not an issue in the case.

The defendant filed a notice of alibi and stated his alibi as follows: "The Defendant was at his residence . . . on March 14, 2004 at the time of the accident. The defendant could not have committed the offenses . . . in the Indictment filed against him." At the initial charge conference following the proof at the trial, defense counsel explained that the defendant sought an alibi instruction not only because he was not present when the victim fell off the Hawk but also because the evidence showed that he was not near the Hawk when its electrical panel was altered to bypass the safety mechanisms. After originally stating that it would charge the jury on the alibi defense, the court later decided not to include an alibi defense instruction with the jury charge. The following exchange occurred after defense counsel objected to the absence of an alibi defense instruction:

[Court:] The Court has reviewed that again. The alibi defense, that is those witnesses who testified that Mr. Martin was not present when Ms. Alexander fell, that evidence is not contested by the State and in fact is conceded in their own proof that he was not present when she fell.

The case law further goes on to say that an alibi instruction must be given where

the time and place of a particular act is important and that the defendant's presence at that time and place is required if there's proof that he was elsewhere. Those are not the facts that have been proven in this case.

And I've re-examined that. I've re-examined the case law, and under the facts of this case, the Court does not feel that the defense of alibi, that is, the instruction should be given. That's been adequately explained, presented and it's uncontroverted [sic] Mr. Martin was not there at the time this lady fell
. . . .

. . . .

[Defense counsel:]    For the record, it is our position that Mr. Martin could not have been present at the time that this ride was altered as is the State's theory; the predicate act was the placement of the jumper.

We have properly raised in this proof that that was done at a time and place where he was not located - - in the State of Florida. We're specifically requesting the instruction of alibi as relates to those events.

[Court:]    The Court will note your objection, but will not give an alibi instruction.

In Tennessee, when the issue of alibi is raised and supported by credible evidence at trial, the trial court must give the jury an instruction on the alibi defense, whether requested or not. Christian v. State, 555 S.W.2d 863, 864 (Tenn. 1977). Our courts have held that a trial court's failure to give an alibi charge, when the defendant is entitled to one, impacts the fundamental fairness of the trial and constitutes reversible error. Manning v. State, 500 S.W.2d 913, 915 (Tenn. 1973). However, "the evidence must first fairly raise the defense of alibi before [an appellate court] will reverse for failure to charge." Id. (emphasis in original).

We agree with the trial court that an alibi defense instruction was not warranted in this case. Black's Law Dictionary defines "alibi" as "[a] defense based on the physical impossibility of a defendant's guilt by placing the defendant in a location other than the scene of the crime at the

-32-

relevant time." Black's Law Dictionary 72 (7th ed. 1999). As evidenced by this definition, traditionally, alibi evidence revolves around the location of the defendant at the time the crime was committed. This is further apparent from the Tennessee Rules of Criminal Procedure's requirements of a defendant's notice of alibi. In response to the state's request of notice of alibi defense, a defendant seeking to offer an alibi defense must provide the state with the written notice of "the specific place or places at which the defendant claims to have been at the time of the alleged offense" and "the name and address of each alibi witness on whom the defendant intends to rely." Tenn. R. Crim. P. 12.1(2)(A). When, as in the present case, the place and time of the offense have not been defined and are not essential elements for the state to prove, alibi is not a relevant defense. See, e.g., United States v. Erlenbaugh, 452 F.2d 967, 975 (7th Cir. 1971) (holding that defendant was not entitled to an alibi instruction because the defendant's presence at a particular place at a particular time was not an element of the charged offense), aff'd on other grounds, 409 U.S. 239, 93 S. Ct. 477 (1972).

The defendant's original notice of alibi defense stating that he was at his home at the time the victim died and evidence of the same did not entitle him to an alibi defense because, as the trial court stated, the state did not dispute that fact. More importantly, based on the state's theory, the defendant's presence at the scene and at the time of the victim's death was not relevant to the question of whether he was guilty of a homicide offense. Furthermore, the defendant mis-characterizes his defense and the evidence that he produced at trial as alibi in nature. His defense was that he could not have placed the jumper wires on the Hawk because they were there before the Hawk arrived at Rockin Raceway. The defendant presented a theory that contradicted the state's theory of what occurred and led to the victim's death. He presented this theory primarily through expert testimony regarding a defect in the ride. He did not provide evidence of his whereabouts at the time the criminal act occurred, largely because the exact time of the criminal act was not established. The defendant was not entitled to an alibi charge because the evidence did not properly raise an alibi defense. The trial court did not err in refusing to give the jury an instruction on alibi defense.

## V. JUDICIAL DIVERSION

At the sentencing hearing, the state called Detective Rene Kendall of the Pigeon Forge Police Department. Detective Kendall testified that there were over seventy-five amusement rides at fourteen locations in Sevierville, Pigeon Forge, and Gatlinburg. He said the area is visited by millions of tourists each year. He said his investigation revealed that there were no inspections of amusement rides other than those done by the owners or operators.

On cross-examination, Detective Kendall acknowledged that he had spoken with John Leonard, the owner of Smoky Mountain Speed Park, which he agreed was a reputable business in the community. He said he did not speak with Mr. Leonard about the contents of a letter Mr. Leonard wrote to the court, in which Mr. Leonard determined after the defendant's trial that there were improper wires on a ride at his business of which Mr. Leonard had been unaware. He said he had no knowledge of this. Detective Kendall said that in his seventeen years as a police officer, Ms.

Alexander's death was the only fatality from an amusement ride of which he was aware. He testified that there had been other incidents, one of which involved two children being dropped from a ride when a shaft broke, another which involved a mechanical bull, and others involving go-carts. He said he had no knowledge of incidents other than those in Pigeon Forge.

The victim's sister, Judy Sprinkles, testified that she and the victim's son were on the Hawk with the victim when the victim fell to her death. She said the victim's family had been devastated. She said that she, the victim's son, and her sister Gail were still receiving psychological counseling. She said the victim's husband was also distraught. She said the victim had two children.

The defendant called the victim's son, Cody Alexander. He testified that he did not see the defendant at the amusement park on the date the victim died. He said he was not able to see the defendant assisting patrons off the ride.

The defense read into the record portions of several letters. These letters generally attested to the defendant's positive character and actions. Some of the letters specifically asked the court to grant judicial diversion and probation.

The presentence report included as attachments letters from the victim's family members and a friend which generally attested to the victim's good character and the impact of her death on them.

The defendant argues that the trial court erred when it denied his request for judicial diversion. The defendant claims that the trial court erroneously considered the need to avoid depreciating the seriousness of the offense and failed to consider all of the proper factors other than the need for general deterrence. The state responds that the trial court did not abuse its discretion in denying diversion.

A defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty to a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See T.C.A. § 40-35-313(a)(1)(B). Judicial diversion allows the trial court to defer further proceedings without entering a judgment of guilt and to place the defendant on probation under reasonable conditions. Id. When the probationary period expires, if the defendant has completed probation successfully, then the trial court will discharge the defendant and dismiss the prosecution with no adjudication of guilt. See id. at (a)(2). The defendant may then apply to have all records of the proceedings expunged from the official records. See id. at (b). A person granted judicial diversion is not convicted of an offense because a judgment of guilt is never entered. See id. at (a)(1)(A).

Judicial diversion is not a sentencing alternative for a defendant convicted of an offense. See T.C.A. § 40-35-104(c). Therefore, there is no presumption that a defendant is a favorable candidate for judicial diversion. See State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). When a defendant challenges the manner of serving a sentence, this court conducts a de novo review of the record with

a presumption that "the determinations made by the court from which the appeal is taken are correct." T.C.A. § 40-35-401(d). However, when the accused challenges the trial court's denial of a request for judicial diversion, a different standard of appellate review applies. Because the decision to grant judicial diversion lies within the sound discretion of the trial court, this court will not disturb that decision on appeal absent an abuse of discretion. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000). An abuse of discretion exists if the record contains no substantial evidence to support the denial. State v. Hammersley, 650 S.W.2d 352, 356 (Tenn. 1983); Bonestel, 871 S.W.2d at 167.

In determining whether to grant judicial diversion, the trial court must consider (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the ends of justice. Electroplating, 990 S.W.2d at 229; State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); Bonestel, 871 S.W.2d at 168. In addition, "the record must reflect that the court has weighed all of the factors in reaching its determination." Electroplating, 990 S.W.2d at 229. If the trial court refused to grant judicial diversion, it should state in the record "the specific reasons for its determinations." Parker, 932 S.W.2d at 958-59. If the trial court "based its determination on only some of the factors, it must explain why these factors outweigh the others." Electroplating, 990 S.W.2d at 229.

In the present case, the trial court made extensive findings on the record relative to its sentencing determination. The court first examined the issue of the length and manner of service of the sentence. In so doing, it recited the relevant considerations, made findings relative to the enhancement and mitigating factors, and weighed the factors in arriving at its four-year probationary sentence. The court then turned to the issue of judicial diversion. In addressing the issue of diversion, the trial court said the following:

> The next consideration is the application for judicial diversion. The Court has considered all of the circumstances of the offenses, the entire record that I've discussed already. The Court must also look to the seriousness of this offense. Ms. June Alexander died. Nothing can be more serious. A family devastated, still undergoing counseling for the emotional trauma they suffer. A lady died right before the eyes of her young son and sister who were sitting beside her. So the Court must deny the application for judicial diversion on that ground, to avoid depreciating the seriousness of the offense.
>
> Evidence was also presented that this community has more than 74 amusement rides, some of which have caused injuries in the past. That there is no official method or – or agency that inspects

rides for safety, or for any other reason, for that matter. That is a matter for the legislature to determine, as to whether or not such inspections should be done, that inspectors should be hired. That is not a matter for this Court.

But the Court must consider that there is no such inspection scheme, so that there must be a deterrent----that is, an encouragement for those who operate amusement rides, particularly those that – that may be somewhat dangerous----to make sure that those rides are operated safely, maintained properly, and that there is [a] deterrent factor. So that the Court, for that reason, as well, denies the application for judicial diversion.

Upon review, we discern some shortcomings in the trial court's findings. First, the court placed determinative weight on factors related to the offense without considering the factors related to the defendant himself. The trial court made no comment on the record when addressing the question of diversion that it had considered the defendant's amenability to correction, his criminal record, his social history, his physical and mental health, and the deterrence value to the defendant. Although the court made findings which were pertinent to some of these factors in determining the length and manner of service of the sentence, the court never acknowledged that it considered and weighed these factors in denying diversion.

Second, although the court made specific mention of the factors to be considered in determining the length and manner of service of the sentence, the court did not mention the factors which must be considered in an application for judicial diversion. Although these factors are similar, there are distinctions. Compare T.C.A. §§ 40-35-102, -103, -210 (stating considerations relevant to determining the length and manner of a defendant's sentence) with Electroplating, 990 S.W.2d at 229 (listing factors relevant to granting or denying judicial diversion). Moreover, in the case of sentencing, the standard with which the court must comply in explaining its determination is less exacting than when the court denies an application for judicial diversion. Under sections § 40-35-210(b) and (e), in determining length and manner of a sentence, a trial court need only consider factors relevant to that case and state orally or in writing what factors were considered and the reasoning behind its decision. Under Electroplating, 990 S.W.2d at 229, the trial court considering judicial diversion must address and weigh all the factors relevant to judicial diversion. See also Parker, 932 S.W.2d at 958-59 (stating that court denying judicial diversion is required to give specific reasons for a denial of diversion). The state urges us to hold that the court's earlier consideration of the defendant's personal characteristics was a sufficient acknowledgment. However, given the distinct factors to be considered and the requirements of acknowledgment and weighing of the diversion factors, we are not prepared to hold that the trial court made an adequate, affirmative showing of its consideration and weighing of all of the relevant considerations.

Additionally, we believe that the trial court erred in denying diversion to avoid depreciating the seriousness of the offense on the basis that the crime involved a death which traumatized the

victim's family. We recognize that the need to avoid depreciating the seriousness of the offense may be considered in whether judicial diversion will serve the ends of justice. However, the fact that the crime involved a homicide is not an appropriate basis to deny diversion. Our legislature has provided that reckless homicide is one of the offenses for which judicial diversion may be granted. See T.C.A. § 40-35-313 (defining offenses excluded from pretrial diversion); State v. Cutshaw, 967 S.W.2d 332, 344 (Tenn. Crim. App. 1997) (holding that trial court abused discretion in denying judicial diversion based upon seriousness of offense of aggravated perjury, an offense which was statutorily eligible for diversion, without considering the defendant's personal characteristics).

Having determined that the trial court erred in its analysis, we are still able to determine "whether the trial court reached the correct result notwithstanding its failure to explain its reasoning." Electroplating, 990 S.W.2d at 229. First, we note that several factors weigh in favor of granting judicial diversion. The record reflects that the defendant was fifty-seven years old at the time of sentencing and had no prior criminal history. He was in good physical and mental health and had never abused alcohol or drugs. He was married, had a history of gainful employment, and was honorably discharged from the Air Force after six years of active duty. He was the father of an adult daughter. The defendant had the support of several friends and members of the community, many of whom attested in letters to the defendant's generosity, good character, and involvement with his church. Nothing in the record indicates that the defendant would not be amenable to correction or that his interests would not be served by diversion.

Despite these positive factors, there are also factors that weigh against granting judicial diversion. The circumstances of the offense do not favor diversion. The defendant was the general manager of an amusement facility which operated a thrill-seeking ride which had been altered to override the safety mechanisms in place to prevent the machine from operating if patrons were in danger of falling to their death. The victim was killed in such a fall in front of her child and sister, who were also on the ride. Despite reckless homicide being an offense for which judicial diversion is available, these facts are particularly troubling. Likewise, the particular need to deter others from unsafe practices and the interests of the public are served by ensuring that amusement rides are safely maintained, particularly given lack of oversight that the state and the City of Pigeon Forge have assumed. The trial judge properly considered deterrence as a factor within the specific context of the community's amusement ride industry. See State v. Davis, 940 S.W.2d 558, 561 (Tenn. 1997) (holding that trial court properly considered the particular need for deterrence in a vandalism case in the context of a labor dispute that led to criminal acts).

Balancing these competing considerations, we conclude that the defendant was, in many respects, an optimal candidate to receive judicial diversion based upon his positive personal characteristics, including his history of productive citizenship and the strong indicators of his amenability to correction. However, we cannot conclude that the defendant's exemplary lifestyle outweighs the circumstances of the offense, the need for deterrence, and the interests of the public. The defendant's recklessness endangered the lives of many people and cost the victim her life. Also, the Hawk had several problems from the time of its arrival at Rockin Raceway, and, yet, the defendant, who was responsible for the safety of the rides, did all he could to keep the ride in

operation. The public places a high level of trust in amusement ride operators, and those in the amusement ride industry must know that they will be held accountable for their actions that risk the public's safety. Moreover, we give the deterrence factor great weight, considering the apparent financial motivation for the defendant's crime, the size of the amusement ride industry in the defendant's community and likelihood that others will be motivated to commit similar crimes, and the publicity surrounding the defendant's case. See State v. Hooper, 29 S.W.3d 1, 10-12 (discussing circumstances relevant to deterrent value of a sentence). A grant of diversion would subvert the interests of the public and the need to deter others from similar dangerous conduct. We conclude that the defendant is not entitled to judicial diversion.

## **CONCLUSION**

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____

JOSEPH M. TIPTON, PRESIDING JUDGE

_____